## The Pope Metal Company, Appellee, v. The Sandoval Zinc Company, Appellant.

### Gen. No. 14,447.

**1.** CONTRACTS—*against whom ambiguities resolved.* If words of a contract are of doubtful import, then he who creates the doubt must have it resolved against his interest and in favor of the party upon whom he caused it to be imposed.

**2.** CONTRACTS—*when and how rescission made.* A rescission should be made at the earliest practicable moment and notice of rescission must be given to the party in interest.

**3.** DAMAGES—*when purchase in open market aptly made.* A party who has contracted for the purchase of merchandise has a right to assume that the other party will carry out his contract and make delivery and until such other party has definitely declined so to do a purchase in the open market need not be made. A purchase made upon the day after definite refusal to make delivery is in apt time.

**4.** MEASURE OF DAMAGES—*in action for failure to deliver merchandise.* In an action for failure or refusal to deliver merchandise as per contract, the measure of damages is the difference between the contract and the market price at the time of such failure or refusal.

**5.** EVIDENCE—*when admission of erroneous, will not reverse.* Where the trial was before the court without a jury the Appellate Court will assume that the trial judge based his judgment on relevant testimony to the exclusion of all to which objections made could be sustained.

**6.** APPEALS AND ERRORS—*what abstract should contain.* Abstracts filed to facilitate the review of a cause should comply with the rules with respect thereto and among other things should contain indices.

Assumpsit. Appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding. Heard in this court at the March term, 1908. Affirmed. Opinion filed May 20, 1909.

**Statement by the Court.** The Pope Metal Company sued The Sandoval Zinc Company in an action of *assumpsit* for breach of contract. The parties waived a trial by jury and the cause proceeded to trial before a judge of the Superior Court, who, after hearing the proofs, rendered a judgment sustaining plaint-

iff's claim and assessing its damages at $375. From that judgment this appeal is prosecuted by defendant.

In assigning error for reversal and in argument, defendant challenges the validity of the contract sued upon and the method adopted in admeasuring damages for its breach.

Defendant among other products manufactured, at St. Louis, Missouri, and at Sandoval, Illinois, a zinc commodity known as "spelter." The contract in dispute was brought about substantially in the following manner: Charles S. Trench & Co., of New York City, brokers in tin plates, lead, spelter, etc., wrote to The Illinois Smelting & Refining Company, inquiring for some "spelter." This letter was turned over to defendant, who wrote Trench & Co., "We are in receipt of your letter of September 9, which has been referred to us by the Illinois Smelting & Refining Co., and in reply we beg to offer you two cars of spelter for September for $5.65 per hundred pounds delivered E. St. Louis basis. This price is subject to immediate wire acceptance on receipt of this letter." Trench & Co. immediately, on September 13, 1905, complied by telegraphing defendant as follows: "Sold fifty tons of Prime Western Sandoval Spelter your offer. Commission ½ %. Telegraph instantly what allowance if delivery taken Sandoval, Ill. Also quote duplicate lot." Defendant responded by telegraph to Trench & Co., acquiescing in the sale in these words: "Have booked your order 50 tons Sandoval Spelter. Send shipping directions. Sandoval and E. St. Louis freight same basis." These telegrams of Trench & Co. and defendant were followed by confirmatory letters from each to the other; defendant declining to make any allowance on account of freight because the rates were the same from Sandoval and E. St. Louis. On September 15, 1905, defendant attempted to rescind the contract and returned all the papers to Trench & Co., but the latter refused to permit of a cancellation, insisting on the contract being carried out as made, and returned to de-

fendant the enclosures sent in its letter of September 15th. Some other correspondence passed between Trench & Co. and defendant, but not until September 27, 1905, did defendant indicate an inclination to repudiate the sale, which it did by letter to Trench & Co., which was called forth by a letter of plaintiff to defendant in which plaintiff notified defendant that it would hold defendant to the terms of its contract and for damages if it failed to perform. To most of the letters of Trench & Co and to one from plaintiff, defendant turned a deaf ear, and it wrote no letters between September 15th and 27th. On October 3, 1905, plaintiff again wrote defendant a letter covering the whole situation and reciting its contract for 50 tons of spelter made with the brokers, Trench & Co., for its account, and asserting that a failure to perform the contract would be met by appropriate steps on its part to enforce its rights thereunder. Plaintiff on the same day wrote Trench & Co., saying *inter alia,* "We now beg to advise you that in the event of the Sandoval Zinc Co. failing to fulfill their contract within a reasonable length of time from the date of this letter, we shall purchase in the open market in E. St. Louis a similar quantity of spelter as that sold us, and should we by such purchase be at any loss, we shall hold them for the amount of such loss." Defendant, spurred in a measure by plaintiff's letter, on the next day, October 4, 1905, wrote Trench & Co. in part as follows: "Kindly see that we have shipping instructions for the 50 tons of spelter sold you Sept. 13 not later than October 9th," and then demanded a new contract "showing that the delivery is to be made from Sandoval." Plaintiff, on being informed, October 6, 1905, by Trench & Co. of this latest attitude of defendant, responded to the effect that it was satisfied with its contract and did not desire to modify it in any way, reciting the fact that it had accepted the contract in writing. However they added, "We do not object to a delivery of zinc at Sandoval, Ill., provided that we can obtain the same

rate of freight to New York, Cambridgeport and Boston, Mass., as we can from St. Louis, but we think under the circumstances you had better insist upon the original delivery at E. St. Louis, Ill." After this Trench & Co. wrote several letters to defendant, but received no responses to any of them until October 28, 1905, when defendant wrote to Trench & Co. under that date, thus: "Replying to your several favors, we wish to state that when we directed you to dispose of fifty (50) tons of spelter we made certain terms and conditions, and as you saw fit to change them we consider same no sale." On October 30, 1905, Trench & Co. communicated to plaintiff by letter defendant's ultimatum of the twenty-eighth of October, repudiating the contract, whereupon plaintiff the next day instructed Trench & Co. to buy 50 tons of spelter in the New York market F. O. B., E. St. Louis, for account of purchase of defendant, which Trench & Co. did, paying therefor $6.02½ per pound, the difference between the contract and market price on the day last mentioned being $375, the amount of the judgment appealed from.

DANIEL M. ROTHSCHILD, for appellant.

PADDOCK, FURNESS, CLARKSON & RUTTER, for appellee; WM. ELIOTT FURNESS, of counsel.

MR. JUSTICE HOLDOM delivered the opinion of the court.

The evidence clearly establishes that Trench & Co. had authority as the broker of defendant to make the sale of 50 tons of spelter, which it did, for its account, to plaintiff on September 13, 1905. Not only was the authority sufficient, but the sale was expressly and in terms ratified by defendant in its letter of same date confirming the broker's telegraphic report of the sale. While two days thereafter there was an attempt on the part of defendant to avoid the sale, in a letter to Trench & Co. returning the papers, yet they accepted

a return of the papers made by Trench & Co., and not until September 27, 1906, did defendant actually repudiate the sale—not by notice to plaintiff, but to its brokers. Defendant, however, receded from its attempt at repudiation by asking Trench & Co. for shipping instructions October 4, 1905, and thereby again ratified the sale which its brokers had made to plaintiff. We therefore have a contract made originally by an agent—the broker—with authority, and a double ratification of the contract by the principal. But defendant finally, and without any logical reason therefor, on October 28, 1905, refused to carry out the contract and repudiated its obligation in virtue of it. With these repeated ratifications of the broker's actions in making the contract, we are little concerned with the question, argued at some length, in relation to the extent of the broker's authority, or the power of Trench & Co. to bind defendant in the terms in which the contract was made. Nor are we able to discover that the contention as to freight rates injected into the case by defendant, is of any moment. If the term "E. St. Louis basis" meant anything else than a reference to the rate of freight obtaining at that point, or, as commonly understood, goods to be "F. O. B.," free on board cars at the point of shipment, it was a latent ambiguity created by defendant in the use of a vague term. If these words are of doubtful import, then he who created the doubt must, under well-settled legal principles, have it resolved against his interest and in favor of the party upon whom he caused it to be imposed. Foster v. Rockwell, 104 Mass. 167; Diversy v. Kellogg, 44 Ill. 114. But even these questions are without any significance if we read the record aright, because, as it clearly shows, plaintiff was willing to accept shipment at either E. St. Louis or Sandoval.

Had defendant the right, in the first instance, to rescind the contract, it should have proceeded so to do without delay, at the earliest moment practicable, and

notice of rescission must be given to the party in interest, for in no case could defendant rescind by notice to its own broker of its intention.    Johnson v. Jones, 4 Barb. 269; Diversy v. Kellogg, *supra*.    Lord Ellenborough's statement in Pickering v. Busk, 15 East. 38, that "a common broker employed in the ordinary course of his trade, is so far a general agent as to have power to bind the principal to third parties by contracts within the scope of the employment, whether the terms of such contract be in accordance with his private instructions or not," is a rule applicable in determining the power of Trench & Co. to bind defendant in its contract with plaintiff, including the terms of shipment embodied in it.    Lobdell v. Baker, 42 Mass. 193.

Defendant's contract was for September delivery, and it should have made delivery during that month; but it failed, and it cannot now be allowed to gain any advantage through its own delinquency.    Moreover, defendant vacillated in its action and again, on October 4, 1905, ratified the contract by asking for shipping instructions.    It is true, it at the same time requested a new contract, but this it had no right to demand. Not until October 28, 1905, did defendant finally repudiate the contract and refuse to perform, in a letter to its brokers, who, on the thirtieth, communicated such action to plaintiff.    In buying the spelter the next day in open market at New York, F. O. B. East St. Louis, plaintiff acted with sufficient promptness.    Plaintiff had a right to assume, up to the time when defendant finally repudiated its contract, that it would perform the same according to its terms.    From the time that the refusal of defendant to carry out the contract came to the knowledge of plaintiff, it had the right to calculate its damages.    Williams v. Woods, 16 Md. 220. Plaintiff filled the contract the day following by buying the spelter in the New York market F. O. B. East St. Louis.    The measure of damages was formulated

upon correct principles applicable to cases of this nature. Such damages suffered by plaintiff through defendant's refusal to perform its contract, is the difference between the contract and the market price at the time of refusal. Thompson v. Woodruff, 7 Coldwell (Tenn.) 401; Diversy v. Kellogg, *supra*.

The spelter was bought for plaintiff by defendant's own broker in the New York market, F. O. B. East St. Louis, promptly after knowledge of repudiation. This was sufficient to fix the market price of spelter at that date as a basis of calculating plaintiff's damages.

Objections are made as to the admissibility of some of the evidence contained in the depositions read by plaintiff on the trial. As the trial was before the court without a jury, we will assume that the learned judge who presided based his judgment on relevant testimony, to the exclusion of all to which objections made could be sustained. An examination of the propositions of law held and refused satisfies us that the court's action thereon was without error.

The counsel on both sides of this case filed abstracts of the record—appellee one in addition to that filed by appellant. They have equally failed to comply with the rule in relation to "indexes." All the exhibits are referred to by number and letter only. Such an index, necessitating an examination of all the exhibits in an effort to find the one needed, is a hindrance rather than a help to the reviewing court, imposing upon it labor which the rule was promulgated to obviate.

The judgment of the Superior Court being without error is affirmed.

*Affirmed.*